Aaron M. Neilson
Rufus I. Peace
CHRISTIAN, SAMSON & BASKETT, PLLC
310 W. Spruce St.
Missoula, Montana 59802
Tel:     (406) 721-7772
Email: aaron@csblawoffice.com; rpeace@csblawoffice.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| BRIAN KENNER,<br><br>Plaintiff,<br><br>vs.<br><br>BITTERROOT TIMBER FRAMES, LLC, THREE MILE CREEK POST & BEAM, LLC, BRETT MAURI, an individual, and JOHN DOES 1-10,<br><br>Defendants. | Cause No. _____<br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Brian Kenner ("Brian"), for his complaint against the Defendants Bitterroot Timber Frames, LLC ("Bitterroot Timber Frames"), Three Mile Creek Post & Beam, LLC ("Three Mile Creek Post & Beam") and Brett Mauri ("Mauri")(collectively "Defendants"), alleges as follows:

## I. PARTIES

1. Defendant's Bitterroot Timber Frames, LLC and Three Mile Creek Post & Beam, LLC are or were limited liability companies organized under the laws of the state of Montana and their principal place of business is in Ravalli County, Montana.

2. Upon information and belief, Bitterroot Timber Frames, LLC and Three Mile Creek Post & Beam, LLC are alter-egos of one another.

3. Upon information and belief, Defendant, Brett Mauri, is and was at all times relevant hereto a resident of Ravalli County, Montana.

4. Defendants John Does 1 through 10 are individuals or entities believed to be responsible in some manner for the occurrences and injuries herein alleged. The claims against John Does 1 through 10 are not yet ripe and/or Plaintiff is ignorant of the true names, capacities and identities of John Does 1 through 10. Plaintiff will amend this Complaint to allege the true names, capacities and identities of John Does 1 through 10 once their true names, capacities and identities are ascertained and/or once the claims against those defendants are ripe.

5. Plaintiff Brian Kenner is and was at all times relevant hereto, a resident of South Dakota.

## II. JURISDICTION AND VENUE

6. Plaintiff realleges and incorporates each of the other allegations of this Complaint as if fully set forth herein.

7. This is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Because the parties are of completely diverse citizenship, and because the matter in controversy exceeds the sum of $75,000, this Court has original jurisdiction over this action under 28 U.S.C. § 1332.

8. Defendants are domiciled within the State of Montana such that this suit does not offend traditional notions of fair play and substantial justice. This Court's exercise of personal jurisdiction over Defendants comports with due process because the Defendants are at home within the State of Montana.

9. The real property which is at issue in this action is located in Ravalli County, Montana and the location where the contractual requirements at issue were to be carried out in Ravalli County, Montana. Ravalli County is within the Missoula Division of the United States District Court, District of Montana.

10. Jurisdiction is proper in this Court.

11. Venue is proper in this Court.

## III. FACTS COMMON TO ALL COUNTS

12. Brian recently retired from federal service as an employee of the United States Park Service and decided to spend his retirement, and likely the remainder of his life in the Bitterroot Valley in Montana.

13. To make this possible, Brian purchased approximately seventeen (17) acres of land located at 841 Fred Burr Rd., Victor, MT 59875, with the intent to build a home on the land.

14. As Brian lives in South Dakota, he was forced to research builders from afar, relying heavily on the internet.

15. In his research into builders, Brian stumbled upon Bitterroot Timber Frames' website which boasts that Bitterroot Timber Frames "brings the beauty and craftmanship of the past together with the function and creativity of the present." and "Bitterroot Timber Frame's craftsman (sic) utilizes decades of expertise to capture all the warmth and richness of a mountain cabin in every home they design and build." A true and accurate copy of the website's landing page is attached as **Exhibit A**.

16. Accompanying these statements on the website are pictures of impressive log homes across Montana, including majestic homes in Big Sky and the Yellowstone Club. In addition, the website provides links to pictures and

description of homes in multiple other states, all of which are also very impressive looking.

17. Bitterroot Timber Frames' website claims they constructed or took part in the construction of all of the homes pictured on the website. In some cases, Bitterroot Timber Frames claims to have worked hand in hand with Three Mile Creek Post & Beam to construct the homes.

18. The obvious reason for the website and the statements and pictures it contains is to lure in clients, and it had the desired effect on Brian.

19. In early 2019, Brian contacted Bitterroot Timber Frames and spoke with the person identified on the website as Bitterroot Timber Frames' CEO, Defendant Brett Mauri.

20. Mauri acted excited to accept Brian's job and expressed that Brian's house would be the smallest one that he had ever built but it was close to his home and his lumber yard in Stevensville, Montana, so he was happy to take it on.

21. Further, Mauri assured Brian that Mauri would act as the "General Contractor" and that Mauri had access to the best subcontractors to perform all the work required to complete the project.

22. Brian's home was to be a two bedroom, two bathroom home with a loft, totaling between sixteen hundred (1600) and eighteen hundred (1800) square feet.

23. Sometime in January 2019, Mauri provided Brian with a draft contract showing an initial cost estimate of Three Hundred Thousand Dollars ($300,000) to complete the entire project. A true and accurate copy of the draft contract is attached as **Exhibit B**.

24. Brian and Mauri discussed the contract and exchanged various drawings of the proposed home. An agreement was reached, and Mauri through Bitterroot Timber Frames was to begin work.

25. Brian later requested the addition of a stand-alone garage and Mauri agreed to construct it for an additional Fifty Five Thousand Dollars ($55,000). A true and accurate copy of the updated draft contract adding the garage is attached as **Exhibit C**.

26. While Brian remained in South Dakota, Bitterroot Timber Frames was to begin work on his future home.

27. In February 2019, Brian made his first payment to Bitterroot Timber Frames in the form of a Five Thousand Dollar ($5,000) deposit, made via a wire transfer from Brian's account.

28. The deposit was followed closely by a second payment of Twenty Four Thousand Four Hundred Thirty Eight Dollars ($24,438) for "Timber Materials," also made by a wire transfer from Brian's account.

29. Throughout 2019 and during most of 2020, Mauri, acting in his role at Bitterroot Timber Frames, made repeated requests for payments from Brian in order to continue the work at the home. Mauri requested these payments be made by either wire transfer or check to Three Mile Creek Post & Beam, and Brian complied.

30. Often times these requests were based upon, at least according to Mauri, the need to source materials for the home. For instance, on at least one occasion Mauri called Brian to inform him that there was a certain batch of cedar wood available which had to be purchased right away or they would lose the opportunity.

31. In response, Brian sent the requested money to Mauri, but it is now apparent that these calls were a ruse to solicit money from Brian and the money was diverted elsewhere.

32. In total, Brian paid Bitterroot Timber Frames, at the request of Mauri, Three Hundred Twenty Seven Thousand Five Hundred Fifty Six Dollars ($327,556).

33. Mauri requested that Brian make payment to and through Three Mile Creek Post & Beam and Brian complied by making his checks payable to Three Mile Creek Post & Beam.

34. Early in 2019, progress was stalled due to difficulty finding an appropriate location to place the home and septic system. Eventually, this was resolved, and the appropriate permits were issued to begin work.

35. Throughout the Summer of 2019, work seemed to progress, albeit slowly.

36. By the end of 2019, the rough exterior of the house and garage were completed, along with the plumbing being roughed in.

37. It was around this time that Brian began to have concerns, Mauri became slow to respond to requests for information and seemed to avoid discussing details of the progress being made.

38. Brian was unable to visit the home until Spring of 2020.

39. When Brian did visit, he was shocked to discover that the work had come to a complete standstill, and the house and garage looked identical to when he last saw them in Fall 2019.

40. After many attempts, Brian was finally able to reach Mauri and was informed that Mauri had been out of town working on some larger projects and that in his absence a foreman failed to conduct the work he was supposed to.

41. Mauri assured Brian that he would address the issue and get the project back on track. Somewhat reassured, Brian returned to South Dakota.

42. Upon information and belief, no additional or minimal additional work was completed after Brian returned to South Dakota. However, Mauri continued to invoice Brian for materials and labor.

43. Then in September 2020, Brian again returned to the site and discovered the lack of progress.

44. Again, after many attempts, Brian reached Mauri who tried to excuse his way out of the situation, assuring Brian that he would have a crew on site immediately.

45. Brian did have contact with an individual who identified himself as a foreman, but upon information and belief, that individual quickly left the job.

46. Despite the complete or nearly complete work stoppage, Mauri never failed to invoice Brian. In total Mauri invoiced Brian for Four Hundred Thirty Five Thousand Five Hundred Forty Seven Dollars ($435,547) much of which was for materials and labor that were never provided.

47. Having no other choice, in November 2020 Brian hired a new contractor who is now on site completing the project.

48. After inspecting the property, the new contractor determined that not only were most of the materials that were invoiced not on site, much of the work that was completed must be redone or modified to either meet code requirements or industry standards.

49. For instance, the exterior walls were constructed using 2x4 boards spaced twenty four (24) inches apart, while the Uniform Building Code requires either 2x6 boards spaced no more than twenty four (24) inches apart or 2x4 boards spaced sixteen (16) inches apart. *See* Uniform Building Code, § 2326.11.2 and Table 23-I-R-3.

50. The roof, as built, did not provide sufficient insulation, referred to as its ("R-value"), the industry standard for Montana is an R-value of 49 and Brian's roof was only an R-value of 24 (which would be fine in California but not in a Montana Winter). *See* Montana Department of Environmental Quality, Energy Savers Guidebook, page 11 and International Energy Conservation Code, 2012, § R402.1.1. In order to achieve the correct R-value, an additional nearly twelve (12) inches of roof material was required to be added on top of the previously installed substandard roof.

51. The plumbing was found to have been installed in such a way as to almost guarantee that it would freeze in the Winter and must be replaced almost entirely.

52. Additionally, the house and garage were not sealed off and the interior of both structures were left exposed to the elements throughout the Winter of 2019, and Spring and Summer of 2020.

53. This exposure caused damage to the interior of the entire structure of both the house and garage.

54. As of this writing, to complete the house and garage an estimated additional Two Hundred Forty Thousand Dollars ($240,000) will be required, in addition to all the money Brian has already expended.

55. The new contractor believes the house and garage will be completed sometime in March of 2021, allowing Brian to finally make his dream move to Montana.

56. A search of the Montana Secretary of State's database of businesses shows that both Bitterroot Timber Frames and Three Mile Creek Beam & Post have been involuntarily dissolved by the Montana Secretary of State.

57. After a search of the Montana Department of Labor & Industry's database of licensed contractors it appears that no contractor's license has been issued to any of the Defendants in this action.

58. Upon information and belief, Defendants Mauri, Bitterroot Timber Frames and Three Mile Creek Post & Beam are operating in violation of multiple laws of the state of Montana.

## **COUNT I – BREACH OF CONTRACT**

59. Brian realleges each of the above paragraphs and allegations of this Complaint as if fully set forth here.

60. Brian and Defendants entered into a contract whereby Defendants would construct a house and garage and Brian would pay Three Hundred Thousand Dollars ($300,000) for the house and Fifty Five Thousand Dollars ($55,000) for the garage.

61. Defendants breached that contract, without limitation, by failing to complete the project, by using incorrect materials, by using incorrect building techniques and by invoicing Brian for services and materials that Brian did not receive.

62. As a consequence of Defendants' breach of contract, Brian suffered damages, both general and special, in an amount to be proven at trial.

## COUNT II – ACTUAL FRAUD

63. Brian realleges each of the above paragraphs and allegations of this Complaint as if fully set forth here.

64. Defendants made representations to Brian, including without limitation that Defendants were licensed general contractors who could and in fact would construct a house for Brian, and Defendants represented to Brian that monies paid by Brian were being used to purchase materials for and fund the construction of Brian's house.

65. Those representations were false.

66. Defendants false representations were material to luring Brian into a contract and were material in misleading Brian into surrendering money to Defendants.

67. Defendants knew that their representations were false.

68. Defendants intended that Brian (and others) rely upon their false statements and take action based on those statements.

69. Brian was unaware of the falsity of Defendants' representations.

70. Brian relied upon Defendants' false representations.

71. Brian had a right to rely upon Defendants' representations.

72. As a result of Defendants' Actual Fraud, Brian suffered damages, both general and special, both general and special, in an amount to be proven at trial.

73. Defendants Actual Fraud entitles Brian to receive attorney's fees, costs, and punitive damages. Mont. Code Ann. § 27-1-221.

## COUNT III – CONSTRUCTIVE FRAUD

74. Brian realleges each of the above paragraphs and allegations of this Complaint as if fully set forth here.

75. Defendants had a duty to present honest information to Brian.

76. Defendants breached that duty by presenting false and misleading information in order to gain an advantage over Brian.

77. As a result of Defendants' presenting false and misleading information, Brian was prejudiced and suffered damages, both general and special, in an amount to be proven at trial.

78. Defendants Constructive Fraud entitles Brian to receive attorney's fees, costs, and punitive damages. Mont. Code Ann. § 27-1-221.

## COUNT IV – UNJUST ENRICHMENT

79. Brian realleges each of the above paragraphs and allegations of this Complaint as if fully set forth here.

80. Defendants received a benefit in the form of payments made by Brian to them for, without limitation, (a) services and materials that were never received, (b) for services incorrectly performed, and (c) for incorrect materials supplies.

81. Defendants knew about the payments and appreciated the benefit to them.

82. Defendants accepted the benefit of the payments and allowing Defendants to retain the benefit would be inequitable.

83. As a result of Defendants' Unjust Enrichment, Brian is entitled to a return of all funds unjustly received and retained by Defendants.

## **COUNT V – NEGLIGENT CONSTRUCTION**

84. Brian realleges each of the above paragraphs and allegations of this Complaint as if fully set forth here.

85. Defendants owed a duty to Brian construct a house and garage in a reasonable manner.

86. Defendants breached that duty by negligently constructing the house and garage in such a manner as to cause damage to Brian.

87. Defendants breach was the direct and proximate cause of Brian's injury.

88. As a result of Defendants' negligent construction, Brian suffered damages both general and specific, in an amount to be proven at trial.

## COUNT VI – NEGLIGENT MISREPRESENTATION

89. Brian realleges each of the above paragraphs and allegations of this Complaint as if fully set forth here.

90. Defendants made negligent representations as to multiple material facts.

91. Those negligent representations were untrue when they were made.

92. Defendants made those representations without any reasonable grounds for believing them to be true.

93. Brian was unaware of the falsity of those representations.

94. Brian justifiably acted in reliance upon the truth of those representations.

95. Brian, as a result of that reliance suffered damages, both general and special, in an amount to be proven at trial.

## COUNT VII – CONSUMER PROTECTION VIOLATION

96. Brian realleges each of the above paragraphs and allegations of this Complaint as if fully set forth here.

97. Defendants employed unfair methods of competition and unfair or deceptive acts in the conduct of their trade in violation of Mont. Code Ann. § 30-14-101, et seq. and Mont. Code Ann. § 30-14-20, et seq.

98. Specifically, and without limitation, Defendants represented themselves as licensed contractors who were capable of building, and that they would in fact would build, a house and garage for Brian.

99. Defendants' representations were false, unfair, and deceptive.

100. Defendants' violation of the Consumer Protection Act caused actual damage to Brian.

101. Defendants' violation of the Consumer Protection Act give rise to damages in accordance with Mont. Code Ann. § 30-14-133, including an award of attorney's fees and costs.

## IV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian Kenner prays for the following relief:

1. For judgment in favor of Brian and against Defendants in an amount to be determined at trial but at least Three Hundred Twenty Seven Thousand Five Hundred Fifty Six Dollars ($327,556);

2. For an award of punitive damages as allowed by law;

3. For an award of pre- and post-judgment interest as allowed by law;

4. For the Defendants to be held jointly and severally liable for all damages awarded to Brian.

3. For an award of costs and attorneys' fees as allowed by Mont. Code Ann. § 27-1-401, 27-1-221, 30-14-133 or other law; and

4. For such other and further relief as the Court deems appropriate.

DATED this 3rd day of February, 2021.

                        CHRISTIAN, SAMSON & BASKETT, PLLC

                        /s/ Rufus I. Peach
                        Rufus I. Peace
                        Attorney for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

DATED this 3rd day of February, 2021.

                        CHRISTIAN, SAMSON & BASKETT, PLLC

                        /s/ Rufus I. Peach
                        Rufus I. Peace
                        Attorney for Plaintiff